Next case on this morning's docket is the case of Janelle Davinroy, Administrator of the State of Carroll-Winneman, deceased, v. Dr. James Wade. We have Mr. John Womack representing the appellant and Mr. Stephen Colford representing the appellee. And Mr. Womack, when you're prepared to begin, you may proceed. I guess I'm here right after the case involving mental health issues. There's a mistake in my brief I wanted to point out to you before we begin. I cited the I quoted from Dr. In the brief I referred on page 6, I referred to No, I'm sorry, it's on page 5. I repeated the citation. I was talking to you about Dr. Wade's deposition. It's Dr. Hockey's deposition. I think I made the mistake two or three times. The case we're here on today began with Carroll-Winman having back pain. She was 58 years old, playing golf, hurt her back, went to find out what was wrong with it. In May of 99, went to hospital, had surgery done and developed an infection. After the first surgery, was discharged without being aware of it and re-hospitalized. Dr. Wade is a general practitioner. That's when he became involved in Carroll's care. She was then hospitalized again on May 24th and discharged, hospitalized again on June 6th and discharged, hospitalized again on June 29th. Discharged July 8th, hospitalized on July 12th, discharged July 30th. She had lots of problems, some of which are totally unrelated to why we're here today. But through all that time, from early June up until the last hospitalization prior to her final hospitalization and her death, Dr. Wade was totally involved in her care. In the July 12th hospitalization, around the 22nd or 23rd, Dr. Wade recognized problems with her kidneys and consulted with Dr. Hock. Dr. Hock, he's a board-certified nephrologist. He diagnosed her with rapidly progressing glomerular arthritis or a possibility of that condition and began treating her as the kidney specialist, as the nephrologist. He ordered medication to treat that in the hospital with Cytoxan and prednisone. Cytoxan is a very, very strong drug, the purpose of which is to suppress the immune system. Prednisone works in conjunction with that, which accelerates the suppression of the immune system. She was on Cytoxan and prednisone from around the 22nd until she was discharged and it was checked. Her levels were checked every day. The main thing one's looking for in monitoring her is her white blood count. The white blood count is too low. The person is subject to other infections, has difficulty fighting those infections and can't die, and that's exactly what happened. On July 30th, Carol was discharged and Dr. Hock was not anywhere around. The discharge instructions were signed, the discharge order was signed by Dr. Wade, the family practitioner. The instructions pursuant to input from Dr. Hockey required that Carol be seen within a week of her discharge and seen every week to two weeks and monitored every week to two weeks for her white blood counts to make sure the Cytoxan levels were not too high. Doctor, that was the plan. That was the care that Carol needed. The issue here is what part, if any, did Dr. Wade play in the monitoring of the patient after she was discharged. The most important date that we have in this chart is September 1st. September 1st is the day Carol should have been checked again and was not checked again for her white blood count. But let's go through that very quickly, what happened. She's discharged on the 30th with instructions to see Wade and Hockey within a week. She sees Wade, Hockey's nowhere around. Wade, without any blood work at all, increases her prednisone. That's why he did that, because she had vertigo and prednisone was corrected. That's great, but prednisone also affected the Cytoxan, which she was already on. Wade says, I don't think about Cytoxan, I don't do anything with Cytoxan, I have nothing to do with Cytoxan, yet prednisone has an effect on that. The next thing that happens is that the Cytoxan runs out, it has to be refilled. Hockey's nowhere around. Wade refills the Cytoxan. The man who doesn't know what he's doing decides that the patient needs to be on Cytoxan again. So he's involved again. So he sees her on August 3rd, raises her Cytoxan level. At that time there was no blood work done. Blood work was done the following day on the 4th. Hockey was supposed to have seen her on the 18th and did not. Hockey saw her for the first time on August 26th. We're talking now almost 26 days, 27 days after her initial discharge. And the 18th and the 26th are important, because those are the days where the screw-up begins. Hockey was supposed to have seen her on the 18th, didn't. Saw her on the 26th. And it appears as if he believed the blood work that he saw on the 26th was taken on the 18th. Because Hockey testifies repeatedly, standard care, from one week to two weeks, checks on the blood work. He ordered her next blood work to be checked two weeks from the 26th, not two weeks from the 18th. Blood work is checked, not checked on the 1st of September, not checked on the 2nd of September, not checked until the 7th of September. The white blood cell counts are faxed to everybody involved, including Wade. Wade still gets it. Wade still, as of 9-2, he's still involved, going back to June. He's the only doctor that's been continually involved in her care from June through 9-7. 9-7, the white blood cell count is faxed to Hockey. He perceives that as 8,700. The zero had a line through it. He thought that was an eight. He thought everything was fine. He sees her in his office the next day. She's not doing well at all. He sees the blood count is, in fact, 0,700, and immediately hospitalizes her. The important facts here are 8-30, I'm sorry, 7-30 when Hockey is not present and Wade does the discharge, 8-3 when Wade increases the prednisone, 8-4 when the first blood work is back, 8-18 when the second blood work is back, and about that time is when Hockey is still not around and Wade increases the Cytoxan. And then the 7th and the 8th and the admission, her blood count continued to go down, down to around 201 points. She developed complications, including ARDS, adult respiratory distress syndrome, and died. The position of the defense is, and I think the position that the court below accepted, was that the plaintiff has to have an expert witness testify that, in my opinion, to a reasonable degree of medical certainty, Dr. Wade violated the appropriate standard of care and his violation of standard of care caused the death. I have to prove those two things, but I do not have to prove them by that specific testimony. I have to have an expert witness to establish what the standard of care is. Whether there's a duty or not is an issue of the law. Wade had a duty, because throughout his testimony and throughout Hockey's testimony, it is clear in the case that the responsibility of monitoring this patient was a shared responsibility, as indicated by Wade's involvement in her monitoring. The facts will be, and the facts of the record are, that Wade and Hockey never had a conversation, about how the patient's going to be monitored. It's Wade's responsibility as much as Hockey's. Wade's not going to measure the amount of cytopsin the patient gets, but he's darn well got to make sure that she gets examined. He's got to make sure that blood work is done and somebody's looking at that blood work. If he doesn't understand it, which he didn't, he has to make sure somebody else does. In this case, he had a shared responsibility, and that's Hockey's testimony, to participate in the monitoring. The interesting thing, so the question is, do I have to have an expert witness say, violate the standard of care? No. I have to have an expert say what the standard of care is, and the standard of care here was an obligation to monitor the patient. And that's everybody's testimony, and that's testimony by Hockey against Wade. And that gets me to the jury. The next question is, was that standard violated? The defense says, well, on September 7th, Wade had nothing to do with the case. Wade wasn't giving the cytopsin. He wasn't managing it. That was all Hockey's responsibility. It clearly was Hockey's responsibility, but it is a shared responsibility. The fact that Hockey violated it doesn't take Wade off the hook, especially when you talk about the relationship between the two, and you look at the testimony that I cited, that I cited accurately, Hockey's deposition testimony. Hockey, on page 70, said that he relied on Wade to assist in monitoring. Hockey had no idea when he saw the results from August 18th, when the lab showed 0700 on September 8th. But as of that time, they never talked about the monitoring. And then on page 6, Hockey says, under question by Dr. Wade's attorney, would it be true with regard to the referring goal, with regard to the treatment plan, et cetera, monitoring may need to be done. And Hockey said, being a gatekeeper doesn't mean you're a sub-specialist involved. May I elaborate on that? He said, when you get a sub-specialist involved, it doesn't mean that you remove yourself from the care of the patient. And that's the case in a nutshell. Wade was not removed from his obligations and responsibility to the patient. Wade did not have to decide whether she should take 0.5 milligrams of Cytoxan or 0.10, but he had to make darn sure that somebody was involved doing that. It was a shared responsibility by both of them. The defense claims that we didn't prove proximal causation. Proximal causation is established, and that is indeed a question, a question of fact. The obligation, Wade had a duty to treat the patient. That duty included a shared responsibility with Hockey in the monitoring. That obligation was breached by both of them. The fact that Hockey breached it and, as a nephrologist, may have had more culpability does not take Wade off the hook. The next issue then is what caused her death. Her death wasn't caused because Hockey took the, because Wade did or didn't administer the Cytoxan, or because Hockey did or didn't administer the Cytoxan. She died because of lack of monitoring. Starting from, and that monitoring problem starts with July 30th when Hockey's not around, July 3rd when the prednisone is increased, July 4th when they finally get the blood count, and there's no indication when or if Hockey ever saw that blood count. July 18th when the blood work is done again, Hockey sends us on the 26th. Wade doesn't know, he knows Hockey's not around because he had to refill the Cytoxan. The next blood work should have been on the 1st. Wade should have said to his client, make sure you keep these every one to two week checkup, make sure you follow up with Hockey, and if you don't have probable reason, be sure and call me. Should have talked to Hockey about who's going to make sure that they get there, and didn't. And the monitoring, and the failure monitoring is what caused this woman's death. She goes in healthy, and I mean it's a tragedy, she goes in relatively healthy and wants to get back to playing golf in May, and dies in October simply because nobody was paying attention to when the white blood count was supposed to have been launched. Mr. Holman, can I ask you a question? What if I said no to that? Excuse me? What if I said no to that? Yes, you may ask me a question. Better not. Did I understand you to say that you don't need expert testimony to prove proximate cause? No, no, I didn't say that at all. Don't make that up. I do not need an expert witness to say the simplistic attitude of the defense is that one doctor has said you violated the standard of care, and that violation caused the death. And I don't have that in this case. But I have enough. I have an expert say the standard of care requires careful monitoring every week to two weeks checking the white blood count. You have to do that every week. But you're saying you don't have to have an expert to support breach. No, no, no. I have that too. The expert testimony. The testimony in the record is you have to have standard of care requires monitoring. And if you don't have monitoring, that's breach. And that's there. That's in the record. I don't know which doctor says that. Hockey says that. And hockey is not my retained expert, but it is an opinion testimony. There is no question here about the breach. There's no question about the cause of death. The only question raised by the defense is the involvement, if any, of Wade in it. I have to prove by expert testimony, or we can talk about the books and the package answers, that kind of nonsense. But in this case, expert testimony, that the patient should have been monitored. And I've got testimony in the record that shows that. I have to prove that Wade had a duty to monitor. And I've got that because Wade, if he didn't have a duty, he undertook to do so, so he acquired the duty. So I've got the duty to monitor, and I've got Wade involved in monitoring, and I've got the failure to monitor causing the death. Now, the expert, like Sondland, was asked, well, did, you know, was Wade involved in what happened on the 7th? No, Wade, he didn't. That's a simplistic answer. I mean, and that's the discovery demo. At trial, I don't think that testimony gets in. But it doesn't make any difference. What the expert thinks is irrelevant. It's a question of fact for the jury to decide. Counsel in their brief said that, if I can find that very quickly. While proximate causation can be proven by circumstantial evidence, there is no evidence of any kind linking a breach of the standard of care by Wade to Winneman's death. And that's just not true. There is all kinds of evidence showing that the failure to monitor is what caused her death. And there's no question. I mean, the citations in the record by defense to Hockey's testimony do nothing except show that there may be a question of fact. But there's no, we have evidence in the record of what the standard is. You have to monitor the patient when she's on cytosol. We have evidence that Wade undertook to perform that duty at least in part. We have evidence that Wade had an obligation to share that responsibility with Hockey. We have her death caused, and Hockey says unequivocally in his deposition, the cause of death was the result of the immunosuppression because of the cytosol and the failure to monitor. If she had been monitored on the first and cut back on the cytosol, what happened on the seventh would not have occurred. And was Wade, did Wade have a point with her on the first? No. Did Wade increase her cytosol or decrease it? No. I don't have a smoking gun, but I have all the evidence I need to get to the jury. At least I hope I do. I hope you agree with that. Have I met, is there facts in the record that support the claim? The jury decides whether there's enough circumstantial evidence once the standards have been established. And I have that evidence throughout this record. So you're saying that the facts in and of themselves are enough for the jury to make a decision without any further medical testimony to support that? What I'm saying right now. Because what I'm kind of wondering is, was there any point in time where the monitoring made a difference or didn't make a difference? And does that need to be supported by medical testimony? Let me answer the first part. The second part, the first answer is yes. There was a point in time. Is there time? I guess I have. God bless her. I know I hate her. That's what we take to stop it. Yeah, you have to prove causation. You have to prove death was caused by the failure to meet the standard of care. They have to be proven here. The key date is September 1st. That's when the second monitoring or the third blood work should have been done, the 4th, the 18th, and the 1st. And do you have an expert to say that? Hockey says that. Hockey says the standard requires monitoring one week to two weeks. San says the same thing, but Hockey clearly says it. The issue is the fact that Hockey didn't do the monitoring on the 1st, did it on the 7th, didn't recognize what happened on the 7th until the 8th. Those are the facts. Does that mean that Hockey is at fault? Absolutely it does. But does it mean that Wade isn't? And the answer is no. There is still testimony there and testimony again by Hockey that Wade shared the responsibility for monitoring, that he was the gatekeeper in his responsibility. And there's no question that Wade was involved in monitoring and should have been involved as of that time. The issue was was she properly monitored? Was she properly seen? Was the blood work done and checked? And Wade had responsibility for that too. And that testimony is in the record. Hockey says it. Hockey says even on crossfire by Wade's attorney, Hockey says it's an effective shared responsibility. Thank you. Thank you. Do you all have the opportunity to rebut Mr. Swafford? Your Honor, my name is Steve Swafford. I'm courting. As the court well knows, a medical malpractice case has to be proved. Every element basically has to be proved by expert testimony, standard of care, whether there was breach of standard of care, and whether even if there's a breach, it was approximate cause of the injury. The plaintiffs, two experts in this case, were just very specific about the only things that they saw that Dr. Wade did wrong. One was increasing the dose of prednisone on August 3rd to treat the vertigo. And they said he shouldn't have done that without conferring with Hockey. And number two was he refilled the cytotoxin prescription on August 23rd when Hockey wasn't available. And there's no evidence. You know, all these facts occurred so long ago, but there is no evidence in the records that Wade and Hockey ever consulted about that. However, Dr. Hockey saw it the next two days later on August 25th. So those are the only two criticisms that the plaintiffs' expert had of Dr. Wade. And in both cases, the two experts said that these two minor deviations from the standard of care did not contribute to the result in this case at all. The increase in the prednisone was minor. The patient was fine for the next almost month. And the fact that Wade didn't contact Hockey about refilling the prescription was irrelevant because Hockey saw it two days later anyway. Why is that a question of fact for the jury to decide whether there was a deviation from the standard of care? Well, because two experts—no, it is for the question of fact as to whether there was two deviations of the standard of care. But the experts affirmatively stated that these two deviations did not cause the plaintiff to see any harm whatsoever. I mean, they—I'm not interpreting it. That's why I said it. And there are citations. My brief's over. I'm not sure I can lay my hand on the page at the moment. There is absolutely—now, Dr. Hockey, the only testimony on which the plaintiffs are relying with regard to Dr. Hockey is that the family physician, the primary caregiver, never stops being the patient's doctor. And so if he observes something, of course he has to report it to the specialist. But there is absolutely no testimony in this record from Dr. Hockey that he ever expected Dr. Wade to monitor those blood tests. He expected when she saw Dr. Wade on August 3rd, of course he would expect anything in the clinical picture to be reported to him. But there was no expectation that Dr. Wade was ever going to monitor these blood tests. And also, there was—Dr. Hockey also stated that when she was released from the hospital on January—July 30th, he or his associate doctor were the ones who were responsible for setting up the schedules for the blood tests and the appointments with Dr. Hockey. So, I mean, Dr. Wade had no responsibility in that regard whatsoever. Both of the experts, Dr. Sohn and Dr. Barnbaum, again affirmatively stated their opinions that Dr. Wade had no duty to monitor the plaintiff's blood counts. So, in the absence of this expert testimony, that anything that Dr. Wade did was wrong, caused any injury, that was the basis on which the trial court entered judgment. And the plaintiff's counsel is essentially offering his opinion as to what the standard of care was when the experts said that wasn't the standard of care with regard to monitoring. And there's just no evidence to support that. Okay. I guess one other fact that's sort of not crucial in my case, because I think I've already stated in my case. You know, Dr. Wade last saw this patient on August 3rd when nothing was wrong with her. I mean, she had her ongoing nephritis condition. I can't pronounce the words at all. You know what I'm talking about. But it was responding to treatment, and he never saw her again. And nobody ever said he ever had to see her again. And the plaintiff's expert said that the whole problem in this case, and there were some criticisms about Dr. Hockey not setting up a more rigorous monitoring schedule of the blood, but he unequivocally stated that everything was all right up until September 1st. And if only Dr. Hockey had had a blood test on September 1st, the whole injury would not have occurred. That's a whole month after my client had anything to do with this case. And so I don't think you can just start interpreting these doctors, these expert doctors' opinions with regard to standard of care and breach and whatnot when it's directly contrary to their statements that Dr. Wade had no duty to monitor whatsoever, that he was entitled to rely on the specialist. That's really my case in a nutshell. But he didn't have a duty, but he chose to have the duty. No, he didn't. He never monitored the blood test, Your Honor. Never did he ever monitor those blood tests. He saw her and clinically evaluated her on August 3rd. And also gave her medication, however, that he gave her medication. For vertigo. For vertigo, but that's the very medication that ended up pressing. No, no, it's not. The only thing, no. Well, in any event, the experts both said that the fact that he did it caused no harm. But beyond that. Isn't the Cytoxan in the prednisone? Okay, which point were we talking? With the appointment, he increased her prednisone because of vertigo. And the only way in which that could have caused any harm, It couldn't have caused any harm. It could have thrown the blood count readings off and made them deceptive. But both experts said to him that they could not offer an opinion that it did so. That they just couldn't. In any event, you know we're talking a month after which the prednisone had been reduced. Does that answer your question? He never assumed any duty to this patient other than to be her general care doctor. To see her when she came in for vertigo. Nobody ever said he had any job to look at these blood count tests. That record is just absolutely devoid of that evidence. Did he refill her Cytoxan? He did refill her Cytoxan on the 23rd when Dr. Hockey was evidently unavailable. But again, they said no. Could that be an assumption of the duty? Not to monitor her. Monitoring is the problem in this case. Well, if he assumed the duty of refilling her Cytoxan without the knowledge of Dr. Hockey. Well, he was criticized for doing that. But both doctors, both experts said it didn't cause any harm. And the prescription was continued on the 25th. At a point which the plaintiff's expert nephrologist, her general care doctor, Dr. Sung, said everything was just fine at that point in time. That he had no trouble with the doses of these medicines up until maybe the end of August. And the whole problem in this case was that she wasn't monitored within two weeks of her last appointment with Dr. Hockey on September 2nd, actually. I mean, we have two experts in this case that unequivocally said that he had no duty to monitor and could rely on Dr. Hockey. And we have two experts in this case that said that any of our criticisms of Dr. Wade were irrelevant to the outcome of this case. I mean, this is not something I'm interpreting or whatnot. It's just plain testimony. There you go. A lot of this is cited in page 10 of my brief. I'm not going to stand here and read the citations with regard to the no duty to monitor. And I have many other record citations in my brief to support everything I said. If there's any questions, that's my case. Thank you, Mr. Spicer. Thank you. Do you have rebuttal, Mr. Walden? The argument you heard now is the same argument that you heard below. Two expert witnesses for the plaintiff retained control of the experts, did not say what I thought they should have said about the issue. And that's a fact. You can see, you've tried lawsuits, you've been involved in cases, you've been involved in a turn of events. The focus was on Hockey as the case proceeded. But there is no requirement under the law that my experts say everything that needs to be said to prevail. I have to have the evidence there. The evidence has to be there. But it doesn't have to be. I could try the lawsuit, once I get past it, complete these cases without an expert witness. I have Hockey. And I have Hockey's language brought on cross-examination by Wade's attorney. The law says that this court's decision, Cummings v. Jha, it's J-H-A, I don't know if that's Jha or Jha. Plaintiff may not present unequivocal or unqualified evidence of causation, but must beat his burden through the introduction of circumstantial evidence from which a jury may infer connected facts that usually and reasonably follow according to common experience. Not the expert testimony, but the facts that are there. I have to establish the standard by expert testimony. The standard is met. I did that. You have to monitor a patient when she's on cytopsin. I have to establish the duty, which is a question of law, not a question of fact. Did Wade have a duty, or did he discharge, or did he incur duty by discharge? There's no question that Wade had duty. You start back with July 30th, discharge. Wade discharged her on cytopsin. He signs the order. He increases the prednisone, and he refills the cytopsin. It shows that he's involved in the monitoring of the patient. Now, I don't want to mislead you. When he refilled the prednisone on the 3rd, that had an effect on the cytopsin. The prednisone has an effect on the cytopsin, and it elevates its effectiveness, makes it more suppressive than it would be without it. But that event didn't cause Carol to die. She didn't die because she used the prednisone. He refilled the cytopsin on the 23rd or whatever it was. That didn't cause her to die. What caused her to die was the failure to monitor her. What Dr. Hockey said is that you... And you monitor through the blood work. It's a combination, Judge. You have to see the patient clinically to see what's going on. But a patient can look fine clinically and have a .07 blood count. There was no testimony of outward signs of problems by the doctors who saw her clinically. I mean, only two times now. I saw her on the 3rd. Bob Wade saw her and said there's nothing wrong with her. Well, there was a lot wrong with her. She was on cytopsin. He knew she was on cytopsin. He knew the effect of that on the patient and the requirement that the patient be monitored. She's not seen again until the, not the 18th, but the 26th. Counsel pointed out he didn't see her again from the 3rd. That's exactly right. He didn't see her again, ever. And he didn't make sure that anybody else did either. My case at this level is not strong. No question about that. And I'm not saying that it is. I am saying, without any question, that the law requires you to resolve issues of fact in favor of the, or against the movement. And the issue here is whether there is an unresolved question of fact. And I have met that minimal burden here. And the defense has not met the burden of proving, taking all the aspects most favorably in my position, that they've been entitled to self-rejection. We do have a duty to monitor, an attempt at discharging that duty, a failure to meet that duty, and questions of background on that point. I don't have to have an expert say that on the 3rd he increased his eye toxin and that caused her death. I have to have somebody say, and counsel is fixated on retained experts. I don't have to have retained experts. When this case goes to trial, I can assure you Vern Bondo is not going to be anywhere around. But I will have, I will have Hockey there. And Hockey will be testifying like he did, and I would have had Hockey at trial. You've heard Hockey's discovery of that, but Hockey would have testified at trial. He's in Idaho, so probably by way of video. But he would have testified as to the standard of care, the shared responsibility. You've got a doctor that saw her for the first time in June, handled all of her admissions, handled all of her care. He's the one that got Hockey involved in the care in July. Wrote the discharge, increased the prednisone, refilled the side toxin. By his admission, never had a conversation with Hockey about the mockery. Hockey says, never had a conversation about the mockery. He knows how important it was for his client to be carefully mocked. He wrote the discharge summary statement of one week to two weeks for the blood work. He doesn't follow along. Thank you. Thank you, Mr. Wolbert. Thank you.